IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES ex rel. OSCAR )
MARTINEZ (#B-10166), )
 )
   Petitioner, )
 ) Case No. 06 C 6590
   v. )
 )
TERRY MCCANN, Warden, Stateville )
Correctional Center, )
 )
   Respondent. )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

 Petitioner Oscar Martinez, by counsel, filed the present petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254(d)(1). For the following reasons, the Court denies

Martinez's petition.

## BACKGROUND

 Martinez does not present clear and convincing evidence challenging the statement of

facts as set forth in the Illinois Appellate Court's opinion affirming the judgment of the Circuit

Court of Cook County, and thus the Court presumes those facts are correct for purposes of its

habeas review. *See* 28 U.S.C. § 2254(e)(1); *see also Daniels v. Knight,* 476 F.3d 426, 434 (7th

Cir. 2007). The Court, therefore, adopts the underlying facts as set forth by the Illinois Appellate

Court, First District, in Martinez's direct appeal. *See People v. Martinez,* Nos. 1-02-2299 & 1-

02-2300 (1st Dist. June 20, 2005) (unpublished order). The Court begins with a brief recounting

of the facts as determined by the Illinois Appellate Court. *See Easley v. Frey,* 433 F.3d 969, 970

(7th Cir. 2006).

## I.    Factual Background

### A.    Roland Warlyn's Trial Testimony

The victim's father, Roland Warlyn, testified that he owned a building in Chicago where he had a catering business. Roland Warlyn fixed a portion of that building to be used as an apartment for the victim, Walter Warlyn. Walter Warlyn lived in the apartment and worked for his father's catering business. Roland Warlyn further testified that he knew that his son was a heroin user and a member of a street gang. On December 16, 1998, Roland Warlyn gave his son permission to borrow a white Ford catering van to go out for the evening. Roland Warlyn testified that his son did not show up for work the next day. Later that day, Roland Warlyn found out that his son had been killed.

### B.    Police Officer Finley's Trial Testimony

Chicago Police Officer D. Finley testified that on December 17, 1998, he was dispatched to Legion Park in Chicago to investigate a possible death. When Finley arrived at Legion Park, he saw Walter Warlyn lying face down. Finley could not feel Warlyn's pulse and consequently called an ambulance. Once Warlyn's body was turned over, Finley noticed severe trauma to Warlyn's face and head, as well as a bullet wound to his temple. Moreover, Finley noticed a large tattoo on Warlyn's abdomen and thought that the tattoo represented membership in the Imperial Gangsters street gang. Finley also found a set of Ford keys in Warlyn's pocket and saw a white Ford van parked 100 yards from Legion Park.

### C.    Police Officer Ricciardi's Trial Testimony

Chicago Police Officer Vito Ricciardi testified that he arrested Jill DeShon on an unrelated drug charge in February 1999. After the arrest, DeShon told Officer Ricciardi that she

had information about Warlyn's murder.  Based on this information, Officer Ricciardi began investigating Ian Bomkamp, Oscar Martinez, and Jeffrey Iniguez.

### D.    Jill DeShon's Trial Testimony

Jill DeShon testified that on the evening of December 16, 1998, she went to Legion Park with some friends.  She further testified that Bomkamp, whom she knew as a ranking member of the Simon City Royals street gang, was with her at the park.  DeShon testified that she left the park by herself to meet Bonnie Lopez at a nearby restaurant, and eventually brought Lopez back with her to Legion Park where Bomkamp remained.  DeShon also testified that at some point after returning to the park, Martinez and Iniguez arrived and were accompanied by two men whom she did not know.  Further, DeShon testified that Martinez was a ranking member of the Simon City Royals gang.  The group stayed at the park – drinking and smoking marijuana. DeShon testified that she did not drink, although she smoked some marijuana.

Thereafter, DeShon testified that they left the park in Martinez's car around 10 or 11 p.m. She further testified that they drove around for a while looking for drugs and eventually stopped at a social club.  Although DeShon and Lopez were allowed to use the club's restroom, the doorman would not let the others inside the club.  DeShon saw Warlyn at the door talking with Bomkamp, Martinez, Iniguez, and the two unknown men.  Warlyn left the club with the group. DeShon got into Martinez's car with Martinez, Iniguez, Lopez, and the two unknown men. DeShon observed Bomkamp leave with Warlyn in the white van.  While in the car, DeShon heard Iniguez say they were going to beat up Warlyn.

DeShon also testified that Warlyn and Bomkamp followed the others to Legion Park in the white van.  Once at the park, Lopez and DeShon walked over to a bench and sat down.  The

rest of the group stood nearby. DeShon then saw Bomkamp, Martinez, Iniguez and the two unknown men hitting Warlyn with their fists while Warlyn yelled for them to stop. After Warlyn fell to the ground, the men began kicking him. Bomkamp then left the group and walked over to a fence at the park. Thereafter, Bomkamp returned with a gun and shot Warlyn. After hearing the gunshot, DeShon told Lopez to get up and the women walked over to Martinez's car and got inside. Martinez, Iniguez, and one of the other men got into the car with them. The other man stayed behind and fired more gunshots. DeShon saw Bomkamp go to the white van, but did not see what he did to the van. Bomkamp and the other man joined the rest of the group in Martinez's car and drove away. DeShon also testified that Iniguez, Lopez, and she were dropped off near her house. Iniguez told her not to say anything about what had happened at the park.

After Officer Ricciardi arrested DeShon on unrelated drug charges, DeShon called him a week later and told him about the murder. DeShon testified that she did not contact the police earlier because Iniguez had threatened her, but that after her arrest, her mother convinced her to contact the police. In addition, DeShon testified that the police did not offer her a deal in exchange for her testimony against Bomkamp, Martinez, and Iniguez. On cross-examination, DeShon admitted that she was a drug user and that she had been arrested for unlawful use of a weapon and possession of a controlled substance with intent to deliver. DeShon denied telling the police about the murder to get lenity on those charges.

### E.     Bonnie Lopez's Trial Testimony

Bonnie Lopez testified that she had known Bomkamp for several years and that Bomkamp was a ranking member of the Simon City Royals street gang. Lopez stated that on December 16, 1998, she was at a restaurant where she met Bomkamp and DeShon after which

4

she went with them to Legion Park. Moreover, Lopez testified that Martinez and Iniguez met them at the park and that there were other unknown men at the park. Lopez stated that after about an hour she got inside Martinez's car with Bomkamp, Martinez, Iniguez, and DeShon. The group then went to a social club where they met Warlyn. Lopez and DeShon were allowed inside the club to use the restroom, but the men were not allowed to enter. After Lopez and DeShon returned from the restroom, the group left the social club. Lopez testified that she, Martinez, Iniguez, and DeShon got into Martinez's car and drove back to Legion Park. Lopez stated that she was intoxicated at the time and did not remember seeing Bomkamp or Warlyn at the park. Once they returned to Legion Park, Lopez rested on a park bench with DeShon after which she heard kicking and someone calling for help. She then heard a gunshot after which DeShon told her to get up. DeShon and Lopez then walked to Martinez's car. While walking, Lopez heard a couple more gunshots and then got into the car with DeShon and Martinez. Martinez drove them away from the park and warned them not to say anything about what had happened. Martinez dropped the women off near DeShon's house.

In addition, Lopez testified that she did not discuss the events of that night with DeShon and that it was not until February 1999 that the police came to her house to ask about Warlyn's murder. Last, Lopez testified that she did not contact the police herself because she was afraid of what might happen to her.

### F. Oscar Montanez's Trial Testimony

At trial, Oscar Montanez testified that he was a member of the Imperial Gangsters street gang and knew Warlyn as a fellow gang member. Montanez testified that members of the Imperial Gangsters wear black and pink and get tattoos depicting the Imperial Gangster crown.

In the summer of 1998, Montanez and Warlyn were in a fight with members of the Simon City Royals. During the fight, Warlyn threw a can and injured one of the Simon City Royals. Montanez, however, testified that neither Bomkamp, Martinez, nor Iniguez were at this fight.

Montanez further testified that on December 16, 1998, he was at Bottoms Up Social Club when Warlyn walked in with a group of Simon City Royals. Montanez also testified that two women were with the group. In addition, Montanez stated that the club was inside Imperial Gangster territory and that he told Warlyn that the group could not enter the club. Warlyn told Montanez that it was "cool" and that he had grown up with the men in the group. Nevertheless, Montanez only allowed the women to come inside to use the restroom. Montanez also testified that he saw Warlyn get into a white van and drive away with the group.

### G. Police Officer Rodriguez's Trial Testimony

Chicago Police Officer Joe Rodriguez testified that he had been a gangs crime specialist for 26 years and was assigned to investigate Warlyn's murder. Officer Rodriguez arrested Bomkamp, Martinez, and Iniguez in connection with his investigation and identified photographs of tattoos found on the defendants representing the Simon City Royals street gang. Officer Rodriguez also identified photographs of tattoos found on Warlyn's abdomen representing the Imperial Gangsters gang. He also testified that the two gangs were fighting in the latter part of 1998 and that Gabriel Flores, who was in custody on unrelated charges, told him this.

### H. Forensic Pathologists' Trial Testimony

A Cook County forensic pathologist testified that he performed an autopsy on Warlyn. The pathologist stated that he saw several abrasions and bruises to Warlyn's face and body, as

well as three gunshot wounds. Tests showed that Warlyn had consumed heroin, cocaine, and alcohol before he was killed. The pathologist believed that Warlyn's death was caused by the multiple gunshot wounds. Furthermore, a forensic scientist with the Illinois State Police analyzed a fingerprint and palm print lifted from Warlyn's white van and matched both prints to print identification cards made by Bomkamp.

## II.    Procedural Background

Following a 2001 jury trial in the Circuit Court of Cook County, the jury convicted Martinez, along with his co-defendants Bomkamp and Iniguez, of first degree murder and aggravated battery for the death of Warlyn. The Circuit Court sentenced Martinez to fifty years' incarceration for murder and a concurrent prison term of five years for aggravated battery. Martinez and Bomkamp appealed their convictions and sentences together, while Iniguez filed a separate appeal. (R. 14-1, Respondent's Rule 5 Exhibits, Ex. A.)

On direct appeal, Martinez and Bomkamp argued that (1) the indictments against them were defective, (2) they were denied a fair trial by the admission of irrelevant and prejudicial evidence of gang tattoos, (3) their right against self-incrimination was violated by photographic evidence of gang tattoos, (4) they were denied their right to confront witnesses, (5) the trial court did not properly instruct the jury, and (6) cumulative error deprived them of a fair trial. (*Id*.) On June 20, 2005, the Illinois Appellate Court, First District, affirmed the Circuit Court of Cook County. (*Id.*, Ex. D.) Martinez filed a petition for rehearing that the Illinois Appellate Court denied on August 2, 2005. (*Id.*, Ex. F.)

Martinez then filed a petition for leave to appeal ("PLA") in the Illinois Supreme Court arguing: (1) his Fifth Amendment right against self-incrimination was violated when the State

photographed his gang tattoos and displayed the photographs to the jury in a testimonial or communicative manner; (2) the trial court erred in refusing to give the jury an accomplice instruction; (3) prejudicial gang-related evidence deprived him of a fair trial; (4) improper hearsay testimony – purporting to support a gang-related motive – deprived him of a fair trial; and (5) persistent limitations on the right to cross-examine denied him a fair trial. (*Id.*, Ex, G.)

Martinez also filed a motion for leave to file an amended supplement to his PLA, which the Illinois Supreme Court granted on September 27, 2005. (*Id.*, Ex. H.) In his supplement, Martinez argued that a conflict existed between two divisions of the First District Appellate Court because the Second Division concluded that the same gang evidence – found to be properly admitted at trial against Martinez – was improperly admitted against his co-defendant Iniguez, who appealed his conviction and sentence separately. (*Id.*) Martinez also raised the additional argument that Illinois Pattern Instruction (IPI) 3.15 was ambiguous and misleading under *People v. Herron,* 215 Ill.2d 167, 294 Ill.Dec. 55, 830 N.E.2d 467 (2005). On December 1, 2005, the Illinois Supreme Court denied Martinez's PLA. (*Id.*, Ex. J.)

On October 13, 2005, Martinez filed a post-conviction petition pursuant to the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1 *et seq.*, in the Circuit Court of Cook County arguing that his trial and appellate counsel were ineffective for failing to raise issues regarding IPI 3.15. (*Id.*, Ex. K.) On September 28, 2006, the trial court denied Martinez's post-conviction petition. (*Id.*, Ex. L.) Martinez then filed a notice of appeal with the Illinois Appellate Court on October 10, 2006. (*Id.*, Ex M.) The appeal from that judgment of dismissal is still pending.

Martinez, who is represented by counsel, brings the following claims in his habeas petition: (1) his rights to due process and equal protection under the Fourteenth Amendment

were violated when two divisions of the Illinois Appellate Court treated similarly situated defendants differently on review of the same evidence; (2) his Fifth Amendment right against self-incrimination was violated when the Circuit Court of Cook County allowed photographs of his tattoos into evidence; (3) the admission of prejudicial gang-related evidence violated his Sixth Amendment right to confrontation and deprived him of a fair trial in violation of due process of law as guaranteed by the Fourteenth Amendment; and (4) limitations to his right to cross-examine certain witnesses violated the confrontation clause of the Sixth Amendment and deprived him of a fair trial under the Fourteenth Amendment. Because none of these habeas claims involves Martinez's post-conviction ineffective assistance of counsel claims still pending before the Illinois Appellate Court, the Court will proceed with Martinez's habeas petition.

## LEGAL STANDARDS

### I.     Habeas Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas relief cannot be granted unless the state court's decision was contrary to, or an unreasonable application of federal law clearly established by the Supreme Court. *Raygoza v. Hulick,* 474 F.3d 958, 963 (7th Cir. 2007); *see also Williams v. Taylor,* 529 U.S. 362, 402-03, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In *Williams*, the Supreme Court explained that a state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Id.* at 405.

Under the "unreasonable application" prong of the AEDPA standard, a habeas petitioner

must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *Id.* at 407. "This reasonableness determination is quite deferential, such that a state decision may stand as long as it is objectively reasonable, even if the reviewing court determines it to be substantively incorrect." *Barrow v. Uchtman*, 398 F.3d 597, 602 (7th Cir. 2005); *see also Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 2462, 162 L.Ed.2d 360 (2005) (state court decision must be objectively unreasonable).

To be considered "unreasonable," a state court's decision must lie "well outside the boundaries of permissible differences of opinion." *Goodman v. Bertrand,* 467 F.3d 1022, 1028 (7th Cir. 2006) (quoting *Hardaway v. Young,* 302 F.3d 757, 762 (7th Cir. 2002)); *see also Dunlap v. Hepp,* 436 F.3d 739, 745 (7th Cir. 2006) (to be reasonable, state court decision must be minimally consistent with facts and circumstances of case); *Burgess v. Watters,* 467 F.3d 676, 681 (7th Cir. 2006) (reasonable state court decision is one of several equally plausible outcomes).

## II.    Procedural Default

Before bringing a habeas claim in federal court, a petitioner must exhaust all remedies available to him in state court. *Bintz v. Bertrand,* 403 F.3d 859, 863 (7th Cir. 2005). Specifically, the "petitioner must establish that he fully and fairly presented his claims to the state appellate courts, thus giving the state courts a meaningful opportunity to consider the substance of the claims that he later presents in his federal challenge." *Id.*; *see also O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). Fair presentment requires the petitioner to set forth the operative facts and controlling legal principles to the state courts for each of his claims. *Bintz,* 403 F.3d at 863.

A habeas petitioner may overcome procedural default by demonstrating cause for the

default and actual prejudice as a result of the alleged violation of federal law or by showing that

the Court's failure to consider the claim will result in a fundamental miscarriage of justice.

*Coleman v. Thompson,* 501 U.S. 729, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The

Supreme Court defines cause sufficient to excuse procedural default as "some objective factor

external to the defense" which prevents a petitioner from pursuing his constitutional claim in

state court. *Murray v. Carrier,* 477 U.S. 478, 492, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). A

fundamental miscarriage of justice occurs when a petitioner establishes that "a constitutional

violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 496.

## ANALYSIS

### I.     Due Process & Equal Protection

The Court first addresses Martinez's due process/equal protection claim. In his habeas

petition, Martinez contends that because two divisions of the Illinois Appellate Court treated the

issue of gang evidence differently – in his and his co-defendant Iniguez's appeals – his rights

under the due process and equal protection clauses of the Fourteenth Amendment were violated.

Martinez, however, failed to fully and fairly presented this argument to the Illinois state courts.

Accordingly, he has procedurally defaulted this habeas claim.

Due to federal-state comity, a petitioner seeking habeas relief in federal court must

establish that he has "fully and fairly" presented his claims to the state courts. *Anderson v.

Benik,* 471 F.3d 811, 814 (7th Cir. 2006); *Bintz,* 403 F.3d at 863. A full and fair presentment

requires a petitioner to present both the operative facts and controlling legal principles to the

state courts – a mere reference to a constitutional issue is not enough. *Sanders v. Cotton,* 398

F.3d 572, 580 (7th Cir. 2005); *Chambers v. McCaughtry*, 264 F.3d 732, 737-38 (7th Cir. 2001).

The Seventh Circuit has set forth several factors that courts may consider when making this determination, including whether the: (1) petitioner relied on federal cases that engage in constitutional analysis; (2) petitioner relied on state cases which apply a constitutional analysis to similar facts; (3) petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; or (4) petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation. *Anderson v. Benik,* 471 F.3d at 815 (citation and quotations omitted). If a petitioner has not fully and fairly presented his habeas claims to the state courts, federal courts are procedurally barred from determining these claims on collateral review. *Id.*; *Chambers,* 264 F.3d at 737.

Martinez, who was represented by counsel on appeal, filed a motion for leave to file an amended supplement to his PLA, which the Illinois Supreme Court granted. In his supplement, Martinez argued that a conflict existed between two divisions of the First District Appellate Court because the Second Division concluded that the same gang evidence found to be properly admitted at trial against Martinez was improperly admitted against his co-defendant Iniguez.

More specifically, Martinez stated that following:

6.      On the same issue, the admission of gang evidence, the First and Second Divisions reached opposite conclusions.

7.      For co-defendant Iniquez,[1] the Second Division held that the admission of gang evidence was reversible error, ordering therein a new trial.

8.      For co-defendants Bomkamp and Martinez, on the same issue, the First Division held the same evidence was properly admitted, and affirmed.

9.      Based on the conflict within the appellate court, defendant respectfully prays for

---

[1] Jeffrey Iniguez's last name is spelled both "Iniguez" and "Iniquez" in the various Rule 5 Exhibits, as well as the parties' memoranda to this Court.

leave to supplement his Petition for Leave to Appeal in this case.

(R. 14-1, Ex. H, Mot. Supp. PLA, at 2.)

In sum, Martinez's argument does not contain any reference to constitutional violations nor does he cite federal or Illinois cases that apply a constitutional analysis. *See Anderson v. Benik,* 471 F.3d at 815. Furthermore, Martinez did not frame his claim in terms so particular as to call to mind a specific constitutional right nor did he allege a pattern of facts that is well within the mainstream of constitutional litigation. *See id.* As the Supreme Court instructs: "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *See Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (per curiam) (internal citation omitted).

Without more, Martinez has failed to fully and fairly present his due process and equal protection claim to the Illinois state courts allowing the Illinois courts "a meaningful opportunity to consider the substance of the claims that he later presents in his federal challenge." *Bintz,* 403 F.3d at 863. As such, Martinez has procedurally defaulted this claim. Because Martinez has not presented any arguments to overcome this default, *see Coleman,* 501 U.S. at 750, the Court is barred from reviewing this claim on collateral review. *See Daniels v. Knight,* 476 F.3d 426, 430 (7th Cir. 2007) ("Out of respect for finality, comity, and the orderly administration of justice, a federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default.") (citation omitted).

## II.     Fifth Amendment Right Against Self-Incrimination

Martinez also argues that his Fifth Amendment right against self-incrimination was

violated when the Cook County Circuit Court allowed the State to photograph his gang tattoos

and use the photographs as evidence.  The Fifth Amendment states that "[n]o person ... shall be

compelled in any criminal case to be a witness against himself."  U.S. Const. amend V.  "To

qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating,

and compelled."  *Hiibel v. Sixth Judicial Dist. Court of Nevada,* 542 U.S. 177, 189, 124 S.Ct.

2451, 259 L.Ed 2d 292 (2004) (citing *United States v. Hubbell,* 530 U.S. 27, 34-38, 120 S.Ct.

2037, 147 L.Ed.2d 24 (2000)).

      With regard to Martinez's Fifth Amendment self-incrimination claim, the Illinois

Appellate Court stated:

>       Defendants next contend admission of photographic evidence showing their gang
> tattoos violated their fifth amendment right against self-incrimination.  *See* U.S. Const.,
> amend. V.  Defendants maintain the photographs were introduced to show they were
> members of the Simon City Royals and were communicative or testimonial in nature.
> The State argues the privilege against self-incrimination does not preclude a criminal
> defendant from being required to exhibit physical characteristics.  *Holt v. United States*,
> 218 U.S. 245, 252-253 (1910).  "[T]he prohibition of compelling a man in a criminal
> court to be witness against himself is a prohibition of the use of physical or moral
> compulsion to extort communications from him, not an exclusion of his body as evidence
> when it may be material."  *Holt*, 218 U.S at 252-253.

>       We agree that defendants' tattoos, unlike other physical characteristics, are
> "communicative" and "testimonial."  But because the tattoos were not compelled
> communications, they are not entitled to the protections guaranteed under the fifth
> amendment.  *See Fisher v. United States*, 425 U.S. 391, 409 (1976) (the privilege against
> self-incrimination applies only when the accused is compelled to make an incriminating
> testimonial communication).  We reject defendants' argument that the State's taking of
> the photographs amounted to compulsion within the meaning of the fifth amendment.
> "[T]here is a significant difference between the use of compulsion to extort
> communications from a defendant and compelling a person to engage in conduct that
> may be incriminating."  *United States v. Hubbell*, 530 U.S. 27, 34-35 (2000) (citing *Holt*,
> 218 U.S. at 252-253).  For example, a criminal suspect may be compelled to give a blood,
> writing or voice sample even though such conduct may provide incriminating evidence.
> *Hubbell*, 530 U.S. at 35.  "The act of exhibiting such physical characteristics is not the
> same as a sworn communication by a witness that relates either express or implied
> assertions of fact or belief."  *Hubbell,* 530 U.S. at 35.  The photographs here depict

images that defendants voluntarily had tattooed on their bodies and are not protected by the fifth amendment. *See People v. Slavin*, 1 N.Y.3d 392, 807 N.E.2d 259 (2004) (photographs of a defendant's tattoos for the purpose of showing motive are not protected by the fifth amendment right against self-incrimination because they do not constitute compelled speech).

*People v. Martinez,* Nos. 1-02-2299 & 1-02-2300, at 11-13 (1st Dist. June 20, 2005).

In short, the Illinois Appellate Court concluded that Martinez's "tattoos, unlike other physical characteristics, were 'communicative' and 'testimonial,'" but nevertheless concluded that the tattoos were not compelled communications. The Illinois Appellate Court based its decision on the Supreme Court's decision in *Hubbell* in which the Supreme Court reasoned:

> The word "witness" in the constitutional text limits the relevant category of compelled incriminating communications to those that are "testimonial" in character. As Justice Holmes observed, there is a significant difference between the use of compulsion to extort communications from a defendant and compelling a person to engage in conduct that may be incriminating. Thus, even though the act may provide incriminating evidence, a criminal suspect may be compelled to put on a shirt, to provide a blood sample or handwriting exemplar, or to make a recording of his voice. The act of exhibiting such physical characteristics is not the same as a sworn communication by a witness that relates either express or implied assertions of fact or belief.

*United States v. Hubbell,* 530 U.S. 27, 34-35, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000) (internal citations omitted). The Illinois Appellate Court also based its opinion on a New York state court case when it concluded that because Martinez voluntarily had his body tattooed, his body was not protected under the Fifth Amendment. *See People v. Slavin*, 1 N.Y.3d 392, 807 N.E.2d 259, 775 N.Y.S.2d 210 (2004).

Here, Martinez argues that the Illinois Appellate Court should have focused on the *Hubbell* Court's analysis concerning the act of producing subpoenaed documents, also known as the act of production doctrine. Specifically, Martinez contends that the Illinois Appellate

Court's decision is contrary to Justice Stevens' concurrence and dissent[2] in *United States v. Doe,* 465 U.S. 605, 620, 104 S.Ct. 1237, 79 L.Ed 2d 552 (1984), and the majority in *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), as well as the *Hubbell* decision. In *Hubbell*, the Supreme Court explained the *Doe* and *Fisher* decisions in a footnote:

> The issue presented in those cases was whether the act of producing subpoenaed documents, not itself the making of a statement, might nonetheless have some protected testimonial aspects. The Court concluded that the act of production could constitute protected testimonial communication because it might entail implicit statements of fact: by producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic.

*Hubbell,* 530 U.S. at 37 n. 19 (internal citations omitted). Martinez, however, fails to give a sufficient explanation as to how the Illinois Appellate Court's decision was contrary to these decisions concerning the "act of production doctrine." In other words, Martinez does not adequately explain how the photographed tattoos in this case are analogous to the compulsion of subpoenaed documents in *Doe*, *Fisher*, and *Hubbell.*

Meanwhile, as the *Williams* decision instructs, a state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Williams v. Taylor,* 529 U.S. at 405. Under this test, the Illinois Appellate Court did not arrive at a conclusion opposite of the Supreme Court concerning a question of law

---

[2] Dissenting and concurring opinions do not constitute clearly established Supreme Court law under Section 2254(d)(1). *See Hubanks v. Frank,* 392 F.3d 926, 932 (7th Cir. 2004); *see also Williams v. Taylor,* 529 U.S. at 412 ("statutory phrase refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision.").

because the question of whether using photographs of a criminal defendant's tattoos – or showing the tattoos themselves – violates a defendant's Fifth Amendment right against self-incrimination was not at issue in *Doe*, *Hubbell*, and *Fisher*, nor were the facts in these Supreme Court cases similar to the case at bar. Instead, the Illinois Appellate Court was guided by the well-established precept that "there is a significant difference between the use of compulsion to extort communications from a defendant and compelling a person to engage in conduct that may be incriminating language." *See Hubbell*, 530 U.S. at 34-35 (citing *Holt v. United States,* 218 U.S. 245, 252-253, 31 S.Ct. 2, 54 L.Ed. 1021 (1910) (Holmes, J.). The Illinois Appellate Court also relied on the *Hubbell* Court's reasoning that the "act of exhibiting such physical characteristics is not the same as a sworn communication by a witness that relates either express or implied assertions of fact or belief." *Hubbell,* 530 U.S. at 35.

Moreover, there is no Supreme Court authority regarding a defendant's Fifth Amendment right against self-incrimination in relation to tattoos being entered into evidence. Therefore, the Illinois Appellate Court's decision cannot be contrary to or an unreasonable application of clearly established Supreme Court law. *See Carey v. Musladin,* ___ U.S. ___, 127 S.Ct. 649, 654, 166 L.Ed 2d 482 (2006) (if there is a lack of direct holding by Supreme Court, state court's analysis cannot be "contrary to" or "unreasonable application" under Section 2254(d)(1)). In the same vein, because *People v. Slavin*, 1 N.Y.3d 392, 807 N.E.2d 259, 775 N.Y.S. 2d 210 (2004), is not clearly established Supreme Court law, the Illinois Appellate Court's reliance on this New York state case cannot be contrary to "clearly established Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1).

**III.    Sixth Amendment Confrontation Clause Claims**

Martinez brings two habeas claims alleging violations of the confrontation clause of the Sixth Amendment. The Sixth Amendment to the United States Constitution guarantees the right of a criminal defendant "to be confronted with the witnesses against him." U.S. Const. amend. VI. In Martinez's initial Sixth Amendment claim, he challenges certain hearsay testimony, which may violate the confrontation clause if the hearsay statement is proffered for the truth of the matter asserted. *See Crawford v. Washington,* 541 U.S. 36, 54, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *United States v. Van Sach,* 458 F.3d 694, 701 (7th Cir. 2006).

### A.    Gang-Related Evidence

Martinez's first confrontation clause claim is that the admission of gang-related evidence, including improper hearsay testimony that supported a gang related motive, violated his Sixth Amendment right to confrontation and deprived him a fair trial in violation of due process of law as guaranteed by the Fourteenth Amendment. Martinez challenges Oscar Montanez's testimony arguing that his testimony violated his right to due process and a fair trial. He also challenges Officer Rodriguez's testimony as impermissible hearsay in violation of the confrontation clause. The Court first turns to Montanez's testimony.

### 1.    Montanez's Trial Testimony

In analyzing Montanez's testimony, the Illinois Appellate Court stated:

> Defendants first challenge the admission of Oscar Montanez's testimony that he and the victim were involved in a street fight with members of the Simon City Royals in the summer of 1998. Defendants argue the testimony should not have been admitted because there was no evidence that defendants were present or knew about the incident. Defendants cite *People v. Smith*, 141 Ill.2d 40, 565 N.E.2d 900 (1990).

> The court in *Smith* held that, while it is entirely proper for the State to prove motive, it is not enough that the State merely produce evidence of motive in the abstract. *Smith*, 141 Ill.2d at 57. "The motive must be attributable to the defendant on trial at the time the crime was committed." *Smith*, 141 Ill.2d at 57. The State in that case attempted

to prove the defendant was motivated by gang affiliation to kill a prison warden who was intolerant of gang activity inside the prison. *Smith,* 141 Ill.2d at 58. The only evidence offered to support the theory was that gang activity occurred in the prison, the victim was intolerant of such activity, the victim had an altercation with a known gang member and the defendant was acquainted with the known gang member. *Smith,* 141 Ill.2d at 58-59. The court held that this was not sufficient to tie the defendant to the State's theory of motive. *Smith*, 141 Ill.2d at 58-59.

Unlike *Smith*, there was evidence in this case that linked defendants to the State's theory that the victim's murder was motivated by gang affiliation. The evidence showed that defendants were members of the Simon City Royals and the victim was a member of the Imperial Gangsters. The gangs did not always get along. The victim had been involved in a street fight with members of defendants' gang months before the murder. And, on the night of the murder, defendants were not allowed inside a club located within Imperial Gangster territory because they were Simon City Royals.

The fact that defendants were not themselves present during the summer street fight does not defeat the State's theory of motive. The summer street fight was evidence that the two gangs did not always get along and supported the State's theory that the gangs were fighting in December 1998, when the victim was murdered. It also supported the State's theory that the victim, who injured a Simon City Royal at the time of the street fight, was a target of the Simon City Royals.

*People v. Martinez,* Nos. 1-02-2299 & 1-02-2300, at 9-10.

The Court first rejects Respondent's argument that Martinez did not properly present his constitutional claim to the Illinois courts because Martinez unequivocally claimed that he was deprived a "fair trial" based on gang-related evidence on direct appeal and in his PLA. "The Supreme Court has observed that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Guest v. McCann,* 474 F.3d 926, 931 (7th Cir. 2007) (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)); *see also California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed 2d 413 (1984) ("Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness."). Because Martinez's claim contained a reference to a constitutional violation, *see Anderson v. Benik,* 471 F.3d at 815, he presented this habeas claim to the Illinois

state courts.

That being said, state court evidentiary errors are generally not cognizable on habeas review. *See Perruquet v. Briley,* 390 F.3d 505, 511 (7th Cir. 2004). Instead, habeas relief is appropriate only if the state court's erroneous evidentiary rulings were so prejudicial that the rulings compromised the habeas petitioner's due process right to a fundamentally fair trial. *Anderson v. Sternes,* 243 F.3d 1049, 1053 (7th Cir. 2001). "This means that the error must have produced a significant likelihood that an innocent person has been convicted." *Anderson v. Sternes,* 243 F.3d at 1053. In other words, "due process does entitle a defendant to a fair trial; but only if the state court committed an error so serious as to render it likely that an innocent person was convicted can the error be described as a deprivation of due process." *Perruquet,* 390 F.3d at 510.

Here, Martinez does not explain how the Illinois Appellate Court's decision concerning the evidentiary rulings as they pertained to Montanez's gang-related testimony violated his right to a fair trial under the Fourteenth Amendment – let alone that the errors were so serious that he was deprived due process of law. As such, Martinez has failed in his burden of establishing that the Illinois Appellate Court applied clearly established federal constitutional law as determined by the United States Supreme Court to the facts of his case in an objectively unreasonable manner. *See Woodford v. Visciotti,* 537 U.S. 19, 24-25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam). Thus, Martinez's habeas claim based on Montanez's gang-related testimony fails.

### 2. Officer Rodriguez's Trial Testimony

Next, Martinez challenges Officer Rodriguez's testimony as impermissible hearsay in violation of the confrontation clause. Regarding this claim, the Illinois Appellate Court

reasoned:

> Defendants next challenge the admission of Officer Joe Rodriguez's testimony that the Simon City Royals and the Imperial Gangsters were fighting in the latter part of 1998. Defendants contend the evidence constituted impermissible hearsay and violated their right to confront a witness against them because it was based on an out-of-court statement made by Gabriel Flores, who did not testify at trial. *See Crawford v. Washington*, 541 U.S. 36 (2004). The State does not dispute the inappropriateness of the testimony, but, rather, argues its admission was harmless beyond a reasonable doubt.
>
> Denial of the right to confront does not warrant a reversal where the error was harmless beyond a reasonable doubt. *People v. Wilkerson*, 87 Ill.2d 151, 156-57, 429 N.E.2d 526 (1981). There are three approaches to measuring whether a constitutional error is harmless beyond a reasonable doubt: (1) focusing on the error to decide whether it might have contributed to the conviction; (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction; and (3) deciding whether the evidence is cumulative or merely duplicates properly admitted evidence. *Wilkerson*, 87 Ill.2d at 157. We find the error in this case harmless beyond a reasonable doubt under the last two approaches. First, there was overwhelming evidence of defendants' guilt, including eye-witness testimony implicating defendants in the crime. Jill DeShon testified she heard Iniguez say they were going to beat up the victim. DeShon and Oscar Montanez saw Bomkamp get into a van with the victim the night of the murder. Bomkamp's fingerprint and palm print were found on the van. Bomkamp and the victim met the others at Legion Park. DeShon saw defendants hitting and kicking the victim. She then saw Bomkamp get a gun and shoot the victim. Bonnie Lopez heard the fighting and the gunshots. Next, Officer Rodriguez's testimony was cumulative of other evidence showing the two gangs did not always get along, including evidence of the street fight and Montanez's testimony that Simon City Royals were not welcome in Imperial Gangster territory.

*People v. Martinez,* Nos. 1-02-2299 & 1-02-2300, at 10-11.

Here, Martinez argues that the Illinois Appellate Court's "characterization of the hearsay testimony is quite disparaging." (R. 21-1, Pet. Reply Brief at 5.) Martinez further contends that the "hearsay had a substantial and injurious effect on the jury's verdict and resulted in actual prejudice because this hearsay supplied the purported motive." (*Id*.) Thus, Martinez argues that the admission of the hearsay testimony was an incurable constitutional error. *See Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Martinez also cites *Brecht v.*

*Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), but does not explain

why Officer Rodriguez's hearsay testimony was not harmless error under the *Brecht* harmless

error standard. Instead, he argues that the "alleged fistfight that occurred five months before the

murder cannot rationally be described as motive evidence for the present murder." (Pet. Reply

Brief, at 6.) Martinez, however, never frames his argument in reference to the standard set forth

in 28 U.S.C. § 2254(d)(1).

Although Martinez did not make his habeas argument within the framework of Section

2254(d)(1), the Court will nonetheless consider whether the Illinois Appellate Court's decision

was "contrary to" or an "unreasonable application" of clearly established Supreme Court

precedent. A violation of the right to confront witnesses guaranteed by the Sixth Amendment is

subject to a harmless-error analysis. *Neder v. United States,* 527 U.S. 1, 18, 119 S.Ct. 1827, 144

L.Ed.2d 35 (1999). "In the habeas context, an error is harmless unless it had a 'substantial and

injurious effect or influence in determining the jury's verdict.'" *Whitman v. Bartow,* 434 F.3d

968, 971 (7th Cir. 2006) (quoting *Brecht,* 507 U.S. at 637 (internal quotations omitted)).

"Therefore, trial errors are often found harmless where the record is replete with overwhelming

evidence of the defendant's guilt." *Whitman,* 434 F.3d at 971 (citing *Neder*, 527 U.S. at 18-19).

In addition, erroneously admitted evidence, if cumulative, is also harmless error. *See Hinton v.*

*Uchtman*, 395 F.3d 810, 821 (7th Cir. 2005) (citing *Brecht,* 507 U.S. at 639); *see also Delaware*

*v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (harmless error factors

include whether testimony was cumulative).

First, the Illinois Appellate Court relied on the applicable constitutional standard albeit

based on an Illinois Supreme Court case. *See People v. Wilkerson*, 87 Ill.2d 151, 156-57, 429

N.E.2d 526 (1981). Nevertheless, a state court's holding is not "contrary to" clearly established federal law even if the state court fails to cite Supreme Court precedent, so long as "neither the reasoning nor the result of the state-court decision contradicts them." *Harrison v. McBride,* 428 F.3d 652, 666 (7th Cir. 2005) (quoting *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002)).

Next, the Illinois Appellate Court reasonably applied this correct legal standard by relying on the overwhelming evidence of Martinez's guilt – including eyewitness testimony implicating him in the murder and assault of Walter Warlyn – in finding that the admission of Officer Rodriguez's hearsay statement was harmless error. In addition, the Illinois Appellate Court emphasized that Officer Rodriguez's testimony was cumulative of other evidence showing the Simon City Royals and the Imperial Gangsters did not get along, including evidence of the street fight and Montanez's testimony that Simon City Royals were not welcome in Imperial Gangster territory.

Accordingly, the Court would be hard-pressed to conclude that the Illinois Appellate Court's decision lies "well outside the boundaries of permissible differences of opinion," and is thus objectively unreasonable under the standard set forth in Section 2254(d)(1). *See Goodman,* 467 F.3d at 1028. In other words, the Illinois Appellate Court's decision is minimally consistent with facts and circumstances of this case. *See Dunlap,* 436 F.3d at 745. Therefore, Martinez's habeas claim based on Officer Rodriguez's hearsay testimony fails.

### B.      Limitations on Cross-Examination

Martinez's next Sixth Amendment claim is that persistent limitations on his right to cross-examine violated his right to confrontation and deprived him of a fair trial under the due

process clause of the Fourteenth Amendment. The right to "confrontation" under the Sixth Amendment means more than confronting witnesses physically – the primary interest secured by the confrontation clause is the right of cross-examination. *Davis v. Alaska,* 415 U.S. 308, 315-16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Dunlap,* 436 F.3d at 741. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674, 683 (1986). "[T]he Confrontation Clause guarantees an ***opportunity*** for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) (per curiam) (emphasis in original).

In reviewing Martinez's claim, the Illinois Appellate Court first addressed the applicable legal standard:

> The right of an accused to confront a witness against him includes the right to cross-examine. *People v. Blue*, 205 Ill.2d 1, 12, 792 N.E.2d 1149 (2001). But the scope of such cross-examination is limited to the subject of direct examination and permissible matter that affects the witness's credibility. *Blue*, 205 Ill.2d at 13. The trial court has discretion to impose reasonable limits on cross-examination to guard against harassment, prejudice, jury confusion, witness safety or repetitive and irrelevant questioning. *Blue,* 205 Ill.2d at 13. This discretionary authority arises only after the court has permitted sufficient cross-examination to satisfy the confrontation clause. *Blue,* 205 Ill.2d at 13.

*People v. Martinez,* Nos. 1-02-2299 & 1-02-2300, at 13.

Next, the Illinois Appellate Court considered Martinez's allegations in the context of Jill DeShon's trial testimony:

The first set of challenges is to testimony the defense sought to elicit about crimes

committed by DeShon. The record shows the defense was given leeway to cross-examine DeShon about these crimes in an attempt to discredit her in front of the jury. The additional examination defendants sought to conduct was repetitive and irrelevant. The second set of challenges concerns testimony intended to show that DeShon had a motive to fabricate her testimony against defendants. Again, this testimony would have been repetitive. Defendants were allowed an opportunity to question DeShon extensively concerning her bias and motives to fabricate. The next set of challenges relates to the extent, if any, of DeShon's communications with Lopez after the murder. Defendants were permitted to ask DeShon whether she spoke with Lopez about the murder. That defendants did not like her answers to their inquiry does not amount to a denial of the right to confront, nor does it give defendants the right to ask repetitive questions on the subject. Defendants next challenge testimony sought to elicit testimony about DeShon's drug habits. Again, the defense was allowed to question DeShon on this subject. Defendants' final set of challenges concerns alleged prior inconsistent statements to police. Defendants were given wide latitude in examining DeShon with respect to statements she made to police, including inconsistencies and omissions within those statements. The record shows defendants were not denied their right to confront DeShon through cross-examination and the trial court correctly exercised its discretion in sustaining the State's objections to repetitive and irrelevant testimony.

*People v. Martinez,* Nos. 1-02-2299 & 1-02-2300, at 13-14.

Next, the Illinois Supreme Court analyzed Martinez's Sixth Amendment claim in the context of Bonnie Lopez's trial testimony:

Defendants first argue they should have been able to question Lopez about the extent, if any, she spoke with DeShon about the murder. Defendants were allowed to ask such questions. The trial court merely sustained objections to repetitive questioning on this subject. Defendants next challenge a question to Lopez about a prior inconsistent statement that Lopez admitted making. The trial court correctly sustained the State's objection to a follow-up question that was argumentative. Defendants next argue they were denied their right to ask Lopez about confusion over the exact day the victim was murdered. The record shows this line of questioning was also argumentative and was properly objected to on this ground. There is no dispute that the victim was killed in the evening of December 16, 1998, or early morning hours of December 17, 1998. The trial court also properly sustained objection to defendants' questioning of Lopez about her memory of that night as argumentative. Defendants next challenge the State's objections to questions relating to Lopez's knowledge of DeShon's motives to fabricate. The trial court properly sustained the objections as speculative and argumentative. The court also properly sustained objections to repetitive questioning about prior inconsistent statements and Lopez's failure to contact police, as well as argumentative questions about Lopez's conversations with DeShon.

*People v. Martinez,* Nos. 1-02-2299 & 1-02-2300, at 14-15.

Finally, the Illinois Appellate Court reviewed Martinez's confrontation clause argument

concerning Oscar Montanez's trial testimony, stating:

> Defendants first argue they were denied the right to question Montanez regarding
> whether he spoke with Gabriel Flores about the police investigation. Defendants
> maintain the questioning was relevant to whether Montanez fabricated his testimony.
> The record shows defendants were permitted to develop this line of questioning. We see
> no denial of the right to confront on this issue. Defendants next argue the trial court erred
> in sustaining an objection to a question relating to Montanez's motive for testifying. The
> trial court properly sustained the objection as argumentative. Defendants argue the trial
> court erred in sustaining an objection to a question concerning the rivalry between the
> Simon City Royals and the Imperial Gangsters. The objection was properly sustained on
> the ground that the question was repetitive. Finally, defendants argue they were denied
> their right to confront when the trial court sustained the State's objection to a question
> directed at whether Montanez knew of the victim's heroin use. The objection was
> properly sustained because the question was irrelevant and evidence of the victim's
> heroin use had already been admitted.

*People v. Martinez,* Nos. 1-02-2299 & 1-02-2300, at 15-16. The Illinois Appellate Court thus

concluded:

> Defendants were not denied their right to confront the witnesses against them. To
> the contrary, we find that they were equipped with attorneys who performed competent
> and zealous cross-examination of the witnesses. As noted earlier, the right to cross-
> examination is not without limitation. The trial court properly exercised discretion to
> limit the defense from irrelevant, repetitive and argumentative questioning.

*People v. Martinez,* Nos. 1-02-2299 & 1-02-2300, at 16.

Instead of addressing the Illinois Appellate Court's application of the facts to the law,

Martinez refers this Court to his opening state court appellate brief and argues that "[t]he

unreasonable limitations placed on cross-examination here are contrary to clear [sic] Supreme

Court precedent in such decisions as *Delaware v. Fensterer,* 474 U.S. 15, 106 S.Ct. 292 (1985);

*Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105 (1974); and *Pointer v. Texas*, 380 U.S. 400, 85

S.Ct. 1065 (1965)." (Pet. Reply Brief, at 7.) As such, Martinez does not argue that the Illinois

Appellate Court's decision was an unreasonable application of clearly established Supreme Court precedent nor does he address any due process concerns.

Despite his "contrary to" argument, the Illinois Appellate Court correctly identified the general principle governing this case – that a criminal defendant has a constitutional right to confront witnesses against him and that the right of an accused to confront witnesses includes the right to cross-examine. *See Davis v. Alaska,* 415 U.S. at 315-16; *Pointer v. Texas*, 380 U.S. 400, 404, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (right to confront witnesses – which is extended to the States by the Fourteenth Amendment – includes the right to cross-examine witnesses); *see also Toliver v. Hulick,* 470 F.3d 1204, 1206 (7th Cir. 2006). The Illinois Appellate Court also stated that trial courts have discretion to impose reasonable limits on cross-examination to guard against harassment, prejudice, jury confusion, witness safety, or repetitive and irrelevant questioning. *See Van Arsdall,* 475 U.S. at 679. Further, the Illinois Appellate Court posited that the right to cross-examination is not without limitation and that the trial court properly exercised discretion to limit the defense from irrelevant, repetitive and argumentative questioning. *See id.; see also Fensterer*, 474 U.S. at 20 ("Confrontation Clause guarantees an ***opportunity*** for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.") (emphasis in original).

As such, the Illinois Appellate Court applied clearly established Supreme Court precedent. A decision in which a state court applies the correct legal rule to the facts of a case cannot be "contrary to" within the meaning of Section 2254(d)(1). *See Garth v. Davis,* 470 F.3d 702, 710 (7th Cir. 2006) (citing *Williams*, 529 U.S. at 406). Accordingly, Martinez's habeas claim based on his right to confront DeShon, Lopez, and Montanez fails.

## <u>CONCLUSION</u>

For these reasons, the Court denies Martinez's petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254(d)(1).

Dated:  March 23, 2007

**ENTERED**

**AMY J. ST. EVE**
**United States District Judge**